IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**CHAD PATTERSON,**                                    Case No. 3:16 CV 2345

      Plaintiff,

      v.                                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                        MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Chad Patterson ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2014, alleging a disability onset date of August 19, 2009. (Tr. 192). His claims were denied initially and upon reconsideration. (Tr. 114, 125). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 132). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 19, 2015. (Tr. 37-76). On October 6, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-32). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on September 22, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Plaintiff was born in August 1979, making him 30 years old on his alleged disability date, and 35 years old on his date last insured. (Tr. 31). He was married, and lived with his wife and children. (Tr. 45, 52-53).

Plaintiff testified he was last employed in 2009, working as a non-commercial truck driver. (Tr. 47). Plaintiff stopped working when he suffered a back injury on the job. (Tr. 42, 47). Subsequent to his injury, Petitioner worked for short periods in 2012 and 2013. (Tr. 42-44). He got the jobs through a workers' compensation vocational rehabilitation program. (Tr. 48-49). He left one job because it required heavy lifting which he could not do, and left another because he "had to drive [his] own truck and that was very difficult for [him] to do as well". (Tr. 43). He worked a third job, but stopped because "walking for [him] [was] very difficult" and he "end[ed] up telling them that [he] couldn't do it." (Tr. 43-44); *see also* Tr. 44 ("And on my way home . . . a deer had hit my car and I couldn't get my car back on the road. So they end up . . . letting me go from that job too".).

Plaintiff testified his back pain had "stayed the same even after [his] surgery." (Tr. 48). He explained he "always" had lower back pain, and had shooting pains down his legs with sitting or standing. *Id.* Plaintiff testified he had difficulty with the vocational rehabilitation program because it required standing for long periods of time, and sitting for two-hour classes was too difficult. (Tr. 49-50).

Plaintiff estimated he could stand in one position for "[n]ot even a minute". (Tr. 50). He estimated he could walk three to four steps without having to stop to rest. *Id.* He spent most of his day in a recliner. *Id.* Plaintiff's medications helped with his back pain "because they just, they all

make me go to sleep". (Tr. 51). Plaintiff testified he would not be able to work because his medication put him to sleep. (Tr. 60-61).

On a typical day, Plaintiff got up, his wife made breakfast, and he went back to sleep for several hours after taking his medication. (Tr. 51-52). He then got up, ate lunch his wife had prepared (or put something in the microwave), and then went back to sleep until dinner. (Tr. 52). His wife made dinner; Plaintiff would talk to her, and then "go right back to bed." *Id.* When he was not sleeping, he would watch television or play video games with his children. (Tr. 53). One of his children played basketball, and Plaintiff testified he attended games, but could not even make it through the first quarter before he would return home. (Tr. 54-55).

Plaintiff drove only if he had to; he drove to doctors' appointments. (Tr. 55). His brother had driven him the ninety minutes to the hearing, stopping "[a]t least three times" so he could get out for five to ten minutes. (Tr. 55-56). He did not do any household chores. (Tr. 52).

Plaintiff's treating physician was Dr. Lehman; he was not undergoing treatment with any other physicians at the time of the hearing. (Tr. 58). Plaintiff had aquatic therapy in the past, which helped only during the sessions itself, with no lasting effects. (Tr. 59). Injections and surgery were similarly unhelpful. *Id.* Plaintiff did not have health insurance and was paying for his doctor and medications out of pocket. (Tr. 59-60).

Relevant Medical Evidence[1]

Plaintiff's back problems began with a workplace injury in August 2009. *See* Tr. 382. In November 2009, Keith Lehman, M.D., Plaintiff's treating physician ordered an MRI. (Tr. 419). It revealed "[d]egenerative disc changes at the L4-L5 level where there is a broad based posterior

---

1. Plaintiff challenges only the ALJ's determination of his physical impairments. Plaintiff has waived argument on issues not raised in his opening brief. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). Thus, the undersigned summarizes only the relevant records.

central disc protrusion measuring 5 mm thickness indenting the thecal sac but not critically narrowing the canal" and "[b]ilateral hypertrophic degenerative facet changes at L4-L5 as well along with a tiny diffuse disc bulge causing moderate left sided foraminal stenosis and only mild right sided foraminal narrowing." *Id.*

Plaintiff reported underwent physical therapy, which he "felt . . . was only making his symptoms worse", and used a TENS unit, but "did not feel it was significantly beneficial for pain control." (Tr. 383).

In September, October, and November 2010, Plaintiff underwent lumbar epidural steroid injection for "[l]umbar radiculopathy with degenerative lumbar disc disease." (Tr. 402-04). Notes indicate Plaintiff "developed the pain after he lifted heavy weight" and "[s]ince then the patient's pain is progressively getting worse". (Tr. 404). He underwent the injections because he was "not responding well to conservative treatment". *Id.* Plaintiff reported "minimal" improvement after the injections. (Tr. 402-03).

In September 2011, Plaintiff underwent another MRI which showed:

> Small, broad-based posterior disc protrusion, L4-5, measuring only about 4 mm in thickness, smaller than it was on the previous exam. There is a small posterior focal tear of the annulus at this level. Mild degenerative facet changes are present at this level as well.

(Tr. 417). The MRI was compared to the November 2009 MRI, and the reading physician explained:

> At L4-5, chronic degenerative changes are present with low signal of the disc and a broad-based posterior disc protrusion, smaller than it was on the previous exam. This is likely recurrent disc protrusion. A small posterior focal tear of the annulus is present at this level. This protrusion slightly indents the thecal sac but does not critically compromise overall canal or foraminal dimensions. Bilateral degenerative facet changes are present.

*Id.*

Plaintiff underwent lumbar epidural steroid injections again in November and December 2011. (Tr. 393-96). Notes indicated worsening pain and "not responding well to conservative treatment." (Tr. 395). In December, Plaintiff reported no improvement in pain levels after the November injection. (Tr. 393).

In February 2012, Plaintiff underwent lumbar decompression surgery. (Tr. 369-70). The operative report notes Plaintiff had "radicular left-sided leg symptoms with positive physical findings in our office but with rotatory symptoms sometimes on the right and sometimes on the left but more frequently on the left than right" and "[m]ore recently he has been having a little bit more trouble with the right." (Tr. 369). During the surgery, Edmund Lawrence, Jr., M.D., "removed disk material" and "opened the lateral recess". *Id.* After surgery Plaintiff reported he no longer had symptoms in his right leg, but new numbness and tingling in his left toes. (Tr. 367); *see also* Tr. 446 (July 2013 note: "He states the back surgery did relieve his right leg symptoms."). Plaintiff reported continued back pain that felt "different". (Tr. 367). Plaintiff was referred for physical therapy after surgery, but it caused a worsening of pain, and Dr. Lehman instructed Plaintiff to discontinue. (Tr. 383).

In July 2013, Dr. Lehman's treatment notes indicate Plaintiff had "reached maximum medical improvement" and advised him "that these are going to be permanent limitations. (Tr. 443). On examination, he noted Plaintiff had back pain, but no radiation to the legs, and no leg weakness, tingling, or weakness. (Tr. 442). His gait and stance were normal. (Tr. 443). Dr. Lehman noted Plaintiff continued to have "discomfort in his low back if he is over active with lifting and bending" and "also has discomfort in his low back if he sits for prolonged periods of time." *Id.* He advised Plaintiff that he needed "a nonproduction type employment as he cannot tolerate repetitive lifting, bending, or twisting". *Id.*

That same month, Larry Kennedy, M.D., examined Plaintiff (at the request of Dr. Lehman) and found "some tenderness over the lumbosacral paraspinals", and "severely" limited range of motion in the back, "limited by 75 to 90% in all planes including forward flexion, extension, and right and left side bending." (Tr. 446-47). He had pain on straight leg raising bilaterally, "but no radicular type symptoms." (Tr. 447). Dr. Kennedy noted he could not accurately perform a motor exam "because of give/go weakness with pain." *Id.* Dr. Kennedy assessed "a lumbar sprain/strain displacement of the lumbar disc without myclopathy and lumbar radiculopathy" and "chronic pain syndrome." *Id.* He recommended "an interdisciplinary comprehensive pain program" and water exercises. *Id.*

In January 2014, Plaintiff reported his back pain was unchanged and he was not able to sit or stand for any length of time "without changing positions" and unable to lift or bend. (Tr. 437). On examination, Dr. Lehman found lower back tenderness on palpation, abnormal range of motion in the lumbosacral spine, a negative straight leg test, and no lower extremity weakness. (Tr. 438). Dr. Lehman noted to continue medication, and work restrictions. *Id.*

In March 2014, Plaintiff reported worsening back pain. (Tr. 435). Dr. Lehman noted Plaintiff's gait and stance were abnormal, instructed Plaintiff to continue medications, and noted: "[w]e will continue his present restrictions as these are permanent and . . . nothing has changed." (Tr. 436).

In April 2014, Plaintiff started physical therapy. (Tr. 458-61). Also in April 2014, Plaintiff returned to Dr. Lehman, reporting continued low back pain "with occasional radiation to his legs". (Tr. 432). He reported being unable to sit or stand more than fifteen minutes without needing to change position. *Id.* Dr. Lehman noted Plaintiff had tried to work, but had been unable, and that he "had difficulty sitting for classes for vocational rehabilitation." *Id.* On examination, Dr. Lehman

noted lower back tenderness, no muscle spasms, abnormal lumbosacral spine range of motion, and a negative straight leg raising test. (Tr. 433). He had no lower extremity weakness, but gait and stance were abnormal. *Id.* Dr. Lehman instructed Plaintiff to "continue his present restrictions", as well as continue medications and water therapy. *Id.* In May 2014, Plaintiff, having undergone five aquatic therapy treatments, was discharged because "he stated nothing is helping and doctor recommended he is to stop treatment." (Tr. 457).

In September 2014, Plaintiff reported his chronic low back pain "[s]ometimes . . . radiates down into his legs", and that it was aggravated by prolonged sitting, standing, bending, twisting, or lifting. (Tr. 474). He reported his medication made him "feel somewhat sleepy or drowsy" and was "only partially effective in controlling his pain." *Id.* Dr. Lehman also noted Plaintiff's medications "do seem to be fairly effective at [sic] least controlling his symptoms." *Id.* On examination, Dr. Lehman noted Plaintiff "had decreased range of motion of his lumbar spine", "did walk with somewhat of a bent gait", had full muscle strength and reflexes, and "[s]traight leg raising test aggravated his back pain but did not give him pain down his legs." *Id.* Dr. Lehman advised Plaintiff to continue his medications; that he needed "to continue the previous limitations on his prolonged sitting and standing"; and that "[h]e cannot bend, twist, or lift." (Tr. 475).

In December 2014, Plaintiff reported continued low back pain that "radiate[d] into his legs more on the left than the right", "limit[ed] his ability to sit or stand for any significant period of time." (Tr. 477). He was "not able to do any walking", "not able to do any lifting" and his medications made him "a bit sleepy." *Id.*[2] On examination, Plaintiff had decreased range of motion

_____

2. The Commissioner notes, regarding this visit: "However, he was *doing well*, with normal strength, despite range of motion deficits." (Doc. 15, at 5) (emphasis added). The undersigned points out that the "doing well" in this record refers to Plaintiff's efforts to cease smoking, not to anything related to his back pain. *See* Tr. 477 ("Patient did stop smoking about 4 weeks ago. He initially used nicotine patches but they made him nauseated so he has done this cold turkey. He

in his lumbar spine, a straight leg raising test caused "discomfort in the back", but his muscle strength and reflexes were normal. *Id.*

In May 2015, Plaintiff reported "continued chronic low back pain that limits his activities" and Dr. Lehman noted Plaintiff took "about 2 Flexeril a day and about 4 tramadol a day which fairly well-controlled his pain." (Tr. 491). He did not take his medication if he planned "to be driving or out." *Id.* Dr. Lehman continued Plaintiff's medications. (Tr. 492).

*Opinion Evidence*

*Treating Physician*

In July 2013, as noted above, Dr. Lehman opined Plaintiff had reached maximum medical improvement and needed "nonproduction type employment as he cannot tolerate repetitive lifting, bending, or twisting. (Tr. 443). Dr. Lehman continued these restrictions in November 2013; and January, March, and April 2014. *See* Tr. 433 ("He needs to continue his present restrictions"); Tr. 436 ("We will continue his present restrictions as these are permanent and . . . nothing has changed"); Tr. 438 ("Continue his work restrictions."); Tr. 440 ("I advised he needed to continue his restrictions.").

In April 2014, Dr. Lehman assessed Plaintiff's physical capacity. (Tr. 425-26). He opined Plaintiff's ability to lift and carry were affected, but did not specify how many pounds Plaintiff could lift or carry. (Tr. 425). He opined Plaintiff could stand or walk for four hours in an eight-hour workday, fifteen minutes at a time. *Id.* Dr. Lehman also noted sitting was affected, but did not specify for how many hours Plaintiff could sit. *Id.* ("Has pain with prolonged sitting."). He stated Plaintiff could rarely perform most postural activities (climb, stoop, crouch, kneel, and

---

feels he is doing well so far."). The ALJ seemingly similarly misconstrued this record, noting that Plaintiff "reported that he was doing well so far" in the context of discussing records about Plaintiff's back impairment. (Tr. 26).

crawl), but could occasionally balance. *Id.* Plaintiff could occasionally reach, frequently perform fine and gross manipulations, but rarely push and pull. (Tr. 426). Dr. Lehman thought Plaintiff should avoid temperature extremes as it "would cause more spasm in back", and noted Plaintiff needed to be able to alternate positions (between sitting, standing, and walking) at will. *Id.* Finally, Dr. Lehman opined Plaintiff experienced moderate pain which would take him off task and cause absenteeism, and Plaintiff would need an additional two hours of unscheduled rest time during an eight-hour workday. *Id.*

As noted above, in September 2014, Dr. Lehman noted he continued his prior limitations on prolonged sitting and standing, and noted Plaintiff could not bend, twist, or lift. (Tr. 475).

In June 2015, Dr. Lehman again assessed Plaintiff's physical capacity. (Tr. 496-97). He opined Plaintiff could occasionally lift or carry ten pounds, but never frequently carry any amount. (Tr. 496). He opined Plaintiff could sit, stand, or walk for three hours in an eight-hour workday, thirty minutes at one time. *Id.* He opined Plaintiff could rarely perform any postural activity (climb, balance, stoop, crouch, kneel, or crawl). *Id.* Plaintiff could occasionally reach, frequently perform fine or gross manipulations, but rarely push or pull. (Tr. 497). He noted Plaintiff should not be exposed to heights or moving machinery because of a "decreased ability to move quickly". *Id.* Plaintiff needed to be able to alternate positions at will, and had moderate pain that would with concentration, take him off task, and cause absenteeism. *Id.* Finally, Dr. Lehman opined Plaintiff would need four hours of unscheduled rest time during an eight-hour workday. *Id.*

*Consultative Examiners*

In August 2012, Plaintiff underwent a physical capacity evaluation with physical therapist Jessye Hartman. (Tr. 382-92). Plaintiff reported back pain, which he rated as 8/10, which increased "especially with forward trunk flexion or activities that promote a forward flexed posture." (Tr.

383). He also reported he was "able to stand or ambulate approximately five minutes prior to increased pain." (Tr. 384). He also reported an inability to drive long distances "due to inability to maintain sitting comfortably." *Id.* Mr. Hartman noted abnormal lumbar range of motion on flexion, extension, left and right side bending. (Tr. 385). After testing, Mr. Hartman offered the following recommendation:

> Based upon the strength classification as established by the Dictionary of Occupational Titles, Mr. Patterson is capable of assuming light work for pushing/pulling, lifting and carrying. The light work level entails exerting up to 20 lbs of force occasionally and/or up to 10# of force frequently, and/or a negligible amount of force constantly to move objects. Mr. Patterson demonstrates safe material handling of 10+ pounds (occasionally) and declines lifting additional weight based upon subjective maximum safe lifting ability. Additionally light work entails walking or standing to a significant degree. Today, the patient demonstrates the ability to sit for 30 minutes, stand for 30 minutes and ambulate 11.5 minutes without significant increase in pain.

> Mr. Patterson demonstrates the ability to push/pull, lift, and carry from 12 inches to waist height within the light work classification. The patient would be most appropriate for employment in which he was able to change position from sit to stand as needed and lift no more than 20 pounds occasionally, and 10 lbs frequently from 12 inches to waist height only; for a maximum of 8 hrs/day up to 40hrs/week. Mr. Patterson falls into the sedentary work category for labor that requires lifting form the floor or overhead heights as he only demonstrates the ability to occasionally lift more than 10 lbs at these levels. It is this therapist's opinion that Mr. Patterson would likely benefit from VOC rehab and/or work re-conditioning to allow the patient to safely return to appropriate employment.

(Tr. 390-91).

As noted above, in July 2013, Dr. Lehman asked Larry Kennedy, M.D., for a second opinion regarding Plaintiff's condition. (Tr. 446-48). Plaintiff reported his back surgery had relieved his right leg symptoms, but his back pain had continued. (Tr. 446). Dr. Kennedy found Plaintiff's range of motion in his back "limited severely and limited by 75 to 90% in all planes including forward flexion, extension, and right and left side bending." (Tr. 447). His "[s]traight

leg raise bilaterally caused some back pain, but no radicular type symptoms. *Id.* Dr. Kennedy did

not offer specific limitations, but regarding work restrictions, noted:

> I will leave that to Dr. Lehman and I typically follow recommendations given based
> on a functional capacity evaluation. If there is any question about what his true
> work restrictions should be, if these were not based on a functional capacity
> evaluation in the past, then I would do a functional capacity evaluation. He may
> well have already had one prior to work restrictions being given.

(Tr. 447).

*State Agency Physicians*

In June 2014, Gerald Klyop, M.D., reviewed Plaintiff's records at the request of the state

agency. (Tr. 85-86). Dr. Klyop opined Plaintiff could occasionally lift or carry twenty pounds, and

frequently lift or carry 10 pounds. (Tr. 85). He could stand or walk for four hours, and sit for six

in an eight-hour workday. *Id.* He limited Plaintiff to occasional climbing of ramps and stairs,

stooping, kneeling, crouching, and crawling; opined he should never climb ladders, ropes, or

scaffolds; but thought Plaintiff ability to balance was unlimited. (Tr. 86). Dr. Klyop noted Dr.

Lehman's April 2014 opinion, and stated he did not give it controlling weight "as the MD provides

no objective findings to support the opinions". (Tr. 85).

In September 2014, William Bolz, M.D., reviewed Plaintiff's records at the request of the

state agency. (Tr. 100-02). He opined Plaintiff was limited in the same ways as Dr. Klyop had, but

added an environmental limitation regarding avoiding hazardous heights. (Tr. 102). He provided

the same comment as Dr. Klyop regarding Dr. Lehman's April 2014 opinion. (Tr. 100).

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 62-75). The ALJ first asked

the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience

who could: lift and carry 10 pounds frequently, and 20 pounds occasionally; stand and walk for

four hours, and sit for up to six hours in an eight-hour workday; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally stoop kneel, crouch, or crawl; occasionally push or pull with the right lower extremity; and who must: avoid concentrated exposure to hazards such as heights and moving machinery. (Tr. 63).[3] The VE testified that such an individual could not perform any past work. *Id.* He then testified that he was "going to interpret the standing and walking, sitting with the light category, provided this was done with a sit stand option", and that such an individual could perform other work.

The ALJ then asked the VE to take the same hypothetical, but change it "so that the person could perform straight sedentary level work, and everything else stays the same". (Tr. 64). The VE testified such an individual could not perform past work, but could perform other jobs. (Tr. 65).

The ALJ then asked the VE to consider an opinion from Dr. Lehman with the following limitations:

> This person can lift and carry 10 pounds occasionally, none on a frequent basis. They can stand and walk for three hours, and sit for three hours in a workday which of course is less than an eight hour workday.
>
> They need a sit stand option to change position every 30 minutes. They can rarely climb, balance, stoop, crouch, kneel and crawl. They can occasionally reach. They can rarely push or pull. They must avoid concentrated exposure to heights and moving machinery.

(Tr. 66). The VE responded such a person could not perform past work or any other jobs. *Id.* The VE also stated that a person who required an extra one-hour break per day, or who would be absent three days per month would not be able to find employment. *Id.*

---

3. The hypothetical also contained mental limitations, which are not at issue here. (Tr. 63).

ALJ Decision

In her decision, the ALJ noted Plaintiff last met the insured status requirements for DIB on December 31, 2014, and had not engaged in substantial gainful activity from the alleged onset date through the date last insured. (Tr. 21). The ALJ found Plaintiff had severe impairments of lumbar disc disease status post surgery and borderline intellectual functioning, but he did not have an impairment or combination of impairments that met or medically equaled one a listed impairment. (Tr. 22). The ALJ then concluded Plaintiff had the residual functional capacity

> to perform sedentary work as defined in 20 CFR 404.1567(a) with the following additional limitations: the claimant is limited to no more than occasional climbing of ramps and stairs. He must never climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, crouch, or crawl. He can occasionally push or pull with his right lower extremity. He must avoid concentrated exposure to hazards such as heights and moving machinery.

(Tr. 25).[4] The ALJ found Plaintiff was unable to perform any past relevant work, was a "younger individual" under the regulations, and had at least a high school education and the ability to communicate in English. (Tr. 30-31). Based on the testimony from the VE, the ALJ found there were other jobs in the national economy Plaintiff could perform. (Tr. 31-32). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 32).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

---

4. The RFC also included mental imitations, which are not at issue here. *See* Tr. 25.

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in her treatment of Dr. Lehman's treating source opinions, and her analysis of physical therapist Mr. Hartman's opinions. The Commissioner responds that there was no error, and the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned finds the ALJ erred in evaluating Dr. Lehman's opinions—and remand is required; but the ALJ did not err in her analysis of Mr. Hartman's opinion.

Treating Physician

Plaintiff contends the ALJ erred in her analysis of Dr. Lehman's opinions; specifically, he contends that her rationale "was not specific, factually in error, and not supported by the substance of the evidence." (Doc. 14, at 8-9). The Commissioner responds that the ALJ "thoughtfully and extensively addressed the medical opinions . . . in determining the limitations for the RFC finding." (Doc. 15, at 8). For the reasons discussed below, the undersigned agrees with Plaintiff that remand is required.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007);

*see also* SSR 96-2p, 1996 WL 374188.[5] "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of

---

5. Although recent revisions to the CFR have eliminated the treating physician rule, such changes were effective March 27, 2017, and do not apply to decisions issued prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

The purpose of the treating physician rule is two-fold. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)). Second, requiring an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*

Dr. Lehman offered two physical capacity assessments—one in April 2014, and one in June 2015. *See* Tr. 425-26; 496-97.[6] With regard to Dr. Lehman's April 2014 opinion, the ALJ explained:

---

6. Dr. Lehman also offered other comments regarding Plaintiff's ability to work in July and November 2013; and January, March, April, and September 2014. *See* Tr. 433, 436, 438, 440, 443, 475. The ALJ gave these limitations "limited weight" because they "fail[e]d to give specific

> Although from a treating source, this opinion is given limited weight as such severe restrictions are not supported by Dr. Lehman's findings on examination of the claimant nor are they supported by the entirety of the treatment record.

(Tr. 27).[7] The ALJ used identical wording regarding Dr. Lehman's June 2015 opinion, but added: "Moreover, there is nothing in the record reflecting a worsening of claimant's condition from Dr. Lehman's prior opinion in April 2014." (Tr. 28). Other than summarizing Dr. Lehman's opined restrictions, this is the entirety of the ALJ's analysis of this treating source's opinion.

Although the ALJ states Dr. Lehman's restrictions are not "supported by the entirety of the treatment record", seemingly addressing the "consistency" factor in 20 C.F.R. § 404.1527(d)(2)—she provides no citation to any record she contends is inconsistent with Dr. Lehman's restrictions. This deprives this Court of the ability to meaningfully review her decision. The ALJ "cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend*, 375 F. App'x at 551. As another court explained:

> This reminds the Court of the criticized phrasing in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 65, 377 (6th Cir. 2013), where the Sixth Circuit rejected as ambiguous and inapt to the standard an ALJ's characterization of an opinion as "not well-supported by any objective findings." The ALJ here does not declare the other evidence substantial and does not particularize what contra evidence she views as objective but worthier of credence. This makes review nearly impossible.

*Tarter v. Colvin*, 2015 WL 4972933, at *5 (E.D. Ky.). Here, the ALJ fails to explain what in the "entirety of the treatment record" undermines Dr. Lehman's opinions. And the regulations require

---

limitations of functions and therefore . . . [were] of limited use . . . in determining the residual functional capacity." (Tr. 27). Plaintiff does not, however, explicitly challenge the ALJ's treatment of these notes. *See* Doc. 14, at 8-13.

7. Although the ALJ does not specifically state, the "severe restrictions" she references appear to be Dr. Lehman's opinion that Plaintiff would: require two hours of extra unscheduled rest periods during an eight-hour workday; need to alternate positions between sitting, standing, and walking at will; and that Plaintiff's pain would cause him to be off-task and cause absenteeism. *See* Tr. 426.

more—"some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552.

Similarly, while the ALJ's opinion purportedly speaks to the "supportability" factor, in stating that "such severe restrictions are not supported by Dr. Lehman's findings on examination of the claimant" (Tr. 27), the ALJ again provides no further explanation, or citation to any records. Thus, the undersigned cannot determine what "findings on examination" the ALJ found inconsistent with Dr. Lehman's opinion.

The Commissioner, in argument, references the prior page of the opinion, in which—in one lengthy paragraph—the ALJ summarized the medical record. *See* Doc. 15, at 10 ("However, in looking at the treatment notes, the ALJ observed that . . ."). In so doing, the Commissioner puts a gloss on the ALJ's opinion that is not apparent upon reading. And, the undersigned may not accept post hoc justifications for that decision. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency); *see also Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) ("The treating physician rule requires an explanation by the SSA, not the court.").[8] Although the ALJ's record evidence summary indicates that in January 2014, Dr. Lehman found no muscle spasms and negative straight leg raising test (Tr. 26) (citing Tr. 437-38), that same record shows lower back tenderness on palpation, and an abnormal range of motion in the lumbosacral spine, as well as abnormal gait and station. *Id.* Moreover, in the same record, Dr. Lehman noted Plaintiff's

---

8. Additionally, the Commissioner now correctly points out that the state agency reviewing physicians concluded Dr. Lehman's opinion was not supported by objective clinical findings, *see* Doc. 15, at 11 (citing Tr. 85, 100), but this again is a post-hoc rationale. The ALJ did not make any note of this particular finding.

back pain "remain[ed] unchanged" and that he was unable "to sit [or] stand[] [f]or any length of time without changing positions" and was "not able to lift or bend." (Tr. 437). Similarly, the ALJ summarized the records from March and April 2014, which had similar findings of abnormal range of motion, abnormal gait and stance, and tenderness in the lower back, as well as negative straight leg raising tests, and no muscle spasms. *See* Tr. 26 (citing Tr. 432-33, 435-36). In April, as the ALJ recognized, Plaintiff reported occasional radiation of the low back pain to his legs. (Tr. 26) (citing Tr. 432). The ALJ summarized these records in a neutral manner, but made no effort—in this summary, or in his later discussion of the opinion evidence—to compare the objective findings made with the restrictions imposed by Dr. Lehman or to analyze why she found those findings inconsistent with the restrictions given. *Compare*, *e.g.*, *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940, *12 (N.D. Ohio) ("The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather the ALJ analyzed the medical evidence and explained how it supported his ultimate RFC determination.").

The Commissioner also points to the state agency physicians' opinions that Plaintiff could perform light exertional work with additional restrictions. (Doc. 15, at 10-11). That other non-treating physicians found Plaintiff capable of more than a treating physician cannot alone serve as a "good reason" for discounting the treating physician's opinion. *See Hensley v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009) (finding that another physician reached the opposite conclusion is "not an adequate basis for rejecting" a treating physician's opinion). Moreover, the ALJ did not provide this as a reason for discounting Dr. Lehman's opinions.

Finally, as to Dr. Lehman's June 2015 opinion, the ALJ offered an additional reason—that "there is nothing in the record reflecting a worsening of claimant's condition from Dr. Lehman's prior opinion in April 2014." (Tr. 27). Dr. Lehman's June 2015 opinion differed from his April

2014 opinion in that it contained specific lifting and carrying restrictions; found Plaintiff more limited in his ability to sit, stand, or walk; added restriction to avoid heights or moving machinery; and concluded Plaintiff could rarely (rather than occasionally) balance. *Compare* Tr. 496-97 *with* Tr. 425-26. As Plaintiff points out, Dr. Lehman's records between these two opinions, however, show increasing radiation of Plaintiff's back pain to his legs, and straight leg raising tests that caused back pain. *Compare* Tr. 474 (September 2014 notation "[s]traight leg raising test aggravated his back pain but did not give him pain down his legs"); Tr. 477 ("His straight leg raising test cause[ed] discomfort in the back") *with* Tr. 433, 438 (negative straight leg raising tests in January and April 2014); *see also* Tr. 474 (September 2014 notation that Plaintiff reported low back pain that "[s]ometimes radiates down into his legs"); Tr. 477 (December 2014 notation that Plaintiff reported low back pain that "radiate[d] into his legs more on the left than on the right"). Whether this evidence sufficiently supports Dr. Lehman's June 2015 opinion, and entitles it to controlling weight, or more weight than the ALJ afforded it is not for the undersigned to determine. What the undersigned can determine, as set forth above, is that the ALJ failed to provide the required good reasons for discounting Dr. Lehman's opinions, and this failure deprives this Court the ability to meaningfully review her decision. *Wilson,* 378 F.3d at 544

In conclusion, the undersigned finds the ALJ failed to give "good reasons"—that is, reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight," *Wilson,* 378 F.3d at 544—for discounting Dr. Lehman's April 2014 and June 2015 opinions. Dr. Lehman treated Plaintiff for an extended period of time and offered multiple opinions that he was more limited than ultimately found by the ALJ. While "[i]t may be true that, on remand, the Commissioner reaches the same conclusion as to [Plaintiff's] disability while complying with the treating physician rule and the good reasons

requirement; however, [Plaintiff] will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached." *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). The undersigned offers no opinion on whether Plaintiff is disabled within the meaning of the statute and regulations, however, the Sixth Circuit "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Id.* at 545 (internal quotation omitted). Such a remand is required here.

<u>Physical Therapist</u>

Plaintiff secondly contends that the ALJ failed to properly evaluate the opinion of Mr. Hartman, the physical therapist who performed a consultative examination. The Commissioner responds that the ALJ provided the required analysis of this "other source" opinion. For the reasons discussed below, the undersigned agrees with the Commissioner.

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in 20 C.F.R. § 404.1513(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-3p, 2006 WL 2329939, at *3. Further, SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. 2006 WL 2329939, at *4-5; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

The ALJ here explained his consideration of Mr. Hartman's opinion:

> As a physical therapist, Jessye Hartman, is not an acceptable medical source and the opinion, standing alone, cannot constitute documentation of severe or disabling limitations. The opinion, however, has been considered with respect to severity and effect on function (Social Security Ruling 06-3p). The undersigned considers the opinion but as it is a one-time evaluation, it is not given significant weight.

(Tr. 28).

Although Plaintiff disagrees with the weight the ALJ assigned to Mr. Hartman's opinion, the undersigned finds he has shown no error in this regard. An ALJ is not required to provide the same "good reasons" for discounting an "other source" opinion, as she is for a treating source. *See York v. Comm'r of Soc. Sec.*, 2014 WL 1213240, at *5 (S.D. Ohio) ("SSR 06–03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion [,]" as the ALJ must do when discounting an opinion by a treating source). (citations omitted);

For the reasons explained above, the undersigned finds the ALJ's discussion of Mr. Hartman's opinion—though brief—satisfies the requirement that she "should explain the weight given to [such] opinions . . . or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's

reasoning, when such opinions may have an effect on the outcome of the case." SSR 06–03p, 2006 WL 2329939, at *6; *see also Cruse*, 502 F.3d at 541. As such, the ALJ did not err in her analysis of Mr. Hartman's opinion. Although Plaintiff contends that the ALJ's analysis takes the axiom of giving "more weight to the opinions of non-treating sources who have at least examined a claimant than non-examining non-treating sources", and "uses it when convenient and discards it when it seeks support for a pre-determined result", (Doc. 14, at 15)[9], having reviewed the record, the undersigned disagrees.

Because remand is required to provide further analysis of treating physician Dr. Lehman's opinion, and, as Plaintiff points out, some of Mr. Hartman's findings are supportive of Dr. Lehman's opinions (e.g., limited range of motion), the ALJ may further consider Mr. Hartman's opinion and examination on remand in evaluating the record as a whole and the analysis of Dr. Lehman's opinion. However, the undersigned finds no error in the ALJ's treatment of Mr. Hartman's within the decision.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses that decision, and remands for further proceedings consistent with this opinion.

  s/James R. Knepp II
  United States Magistrate Judge

---

9. Plaintiff specifically objects to the ALJ's decision to discount Mr. Hartman's opinion as a one-time examination, while also giving "great weight" to state agency psychological consultants who never examined Plaintiff. *See* Doc. 14, at 14. As the Commissioner points out, however, these reviewing physicians had the benefit of reviewing Plaintiff's records as a whole.